## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54755-4-II |
| Respondent, | |
| v. | |
| MICHAEL LEE JOHN MARQUEZ, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, A.C.J.—Michael Lee John Marquez was staying with a friend's family when Marquez molested his friend's seven-year-old daughter. Marquez appeals his conviction for one count of first degree child molestation, arguing that his right to a unanimous jury verdict was violated because multiple acts of inappropriate touching were alleged, but the State did not elect one act to rely on and the trial court did not give a unanimity instruction to the jury. He also challenges two conditions of community custody, which the State largely concedes were improperly imposed. Finally, Marquez contends that the trial court did not mean to impose the supervision fee and that the provision allowing interest on his legal financial obligations should be stricken.

We hold that Marquez's right to a unanimous jury was not violated because the State proved one continuous course of conduct. Therefore, we affirm Marquez's conviction. We accept the State's concessions and remand for the trial court to modify Marquez's conditions of community custody accordingly. The trial court may address the supervision fee and must strike the interest provision on remand.

FACTS

When she was seven years old, KR disclosed to a family friend, Christina Feddema, that Marquez had touched her inappropriately. Marquez was a childhood friend of KR's father and was staying with KR's family. There were times when Marquez was the only adult home with the children. After KR's disclosure, Feddema told KR's mother and reported the allegations to law enforcement. The State charged Marquez with one count of first degree child molestation.

A.       Trial

At the jury trial, KR testified that Marquez "touched [her] vagina with his tongue." Verbatim Report of Proceedings (VRP) (Feb. 27, 2020) at 303. She did not remember whether anything else happened, including whether Marquez touched her with his penis. She did not know what time of day it was when the touching occurred, but she knew it happened in her bedroom. KR told her older brother about the touching, and he told Feddema.

Feddema testified that she then asked KR, "[H]as an adult in your life ever touched you inappropriately?" *Id.* at 312. KR began to cry and said that Marquez "dared her to sleep with no underwear on, because they were playing truth or dare. He dared her to sleep with no underwear on for a week . . . [and] at nighttime when she was sleeping, touched his penis to her vagina." *Id.* at 317. KR did not mention oral sex to Feddema. When asked if she could discern when the molestation occurred, Feddema responded, "I know that it had happened after they had a family movie night down at the movie theaters, which was approximately two weeks prior to the 14th [of July, when KR disclosed to Feddema,] . . . so around the 1st [of July]." VRP (Feb. 28, 2020) at 389-90.

KR's father testified that KR disclosed the molestation to him, but he did not remember very much from the conversation. After KR said that Marquez "touched her privates," KR's father "tried to block out what else she was saying." VRP (Feb. 27, 2020) at 324.

KR was also interviewed by two professionals. Sue Villa, a child specialist forensic interviewer, testified that KR told Villa about Marquez "touching her and licking her . . . in her vaginal area." VRP (Feb. 28, 2020) at 351. KR "talked about the fact that [Marquez] told her not to tell and that if she did that he wouldn't be able to take her to movies anymore." *Id.* "[S]he also talked about the fact that [Marquez] had asked her to not wear her underpants to bed, that that was something that she remembered." *Id.* at 352.

Lisa Wahl, a family nurse practitioner, similarly testified that, using diagrams, KR described that Marquez "put his mouth on her front private, which was identified as the vagina, and that he put his front private, which was his penis, on her front private - again, her vagina." *Id.* at 359. Wahl recalled that as KR was describing what happened with Marquez, she was coloring and getting "more and more aggressive" with the crayon, and that she "went from coloring to stabbing at" the male diagram with the crayon. *Id.* at 360-61.

KR did not testify that Marquez touched her inappropriately more than once, nor did any witness testify that KR said he touched her this way on more than one occasion.

The jury was not given a *Petrich*[1] instruction, informing them of the need to be unanimous as to a single act. Marquez did not object to the proposed instructions, and he did not request any additional instructions.

---

[1] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984) ("When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct," the State must either "elect the act upon which it will rely for conviction" or

In its closing, the State emphasized that KR had "made consistent statements" to multiple people. *Id.* at 401. The State only discussed the testimony and allegation that Marquez put his mouth on KR's vagina and did not mention any other specific type of sexual contact. In reviewing the elements of the crime, the State noted that the date range in the to convict instruction was "on or about and/or between January 1st, 2017 and July 4th, 2017," but it told the jury that the incident "would have been on the 1st [of July]." *Id.* at 404.

The jury found Marquez guilty of one count of first degree child molestation.

B.      Sentencing

The trial court sentenced Marquez to a minimum of 68 months and a maximum of life and 36 months of community custody. The trial court stated at sentencing, "With regard to legal financial obligations the Court is only going to impose the mandatory minimum of $600. Mr. Marquez has limited ability to meet his legal financial obligations. . . . [Y]our total legal financial obligations are $600." VRP (Apr. 2, 2020) at 439-40.

The trial court imposed conditions of community custody, including a requirement that Marquez "pay for all counseling services/therapy costs incurred by [KR] and members of [her] immediate family as a direct result of [the] assault." Clerk's Papers (CP) at 57. It also included a requirement that Marquez "undergo, at [his] expense, periodic polygraph and/or plethysmograph testing to measure treatment progress and compliance at a frequency determined by [his] Sexual

---

instruct the jury "that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt."), *abrogated by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

Offender Treatment Provider (SOTP), [community corrections officer], or [Department of Corrections] Policy." CP at 58.

The judgment and sentence included language that ordered Marquez to "pay supervision fees as determined by [the Department of Corrections]" and that permitted his financial obligations to "bear interest from the date of the judgment until payment in full, at the rate applicable to civil judgments." CP at 49, 51; *see also* CP at 57 (requiring payment of supervision fee as a condition of community custody).

Marquez appeals his conviction, the conditions of community custody described above, and the imposition of the supervision fees and interest.

## ANALYSIS

### I. JURY UNANIMITY

Marquez argues his right to a unanimous jury was violated because two distinct acts of child molestation were alleged, but the State did not elect one act to rely on and the trial court did not give a *Petrich* instruction. He also claims that this error was prejudicial. We disagree.

A.     Unanimity Requirement

The federal and state constitutions guarantee criminal defendants the right to a unanimous jury verdict. U.S CONST. amend. VI; WASH. CONST. art. I, § 22. "When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct," there are two ways to protect jury unanimity. *Petrich*, 101 Wn.2d at 572. Either the State may elect one act to rely on in seeking a conviction, or the trial court may instruct the jury that it must unanimously agree that "the same underlying criminal act" has been proved beyond a reasonable doubt. *Id.*; *see also State v. Carson*, 184 Wn.2d 207, 228, 357 P.3d 1064

(2015) (concluding that the State satisfied this requirement where it "clearly and explicitly elected the three acts on which it was relying for conviction" and "specifically disclaimed its intention to rely on any other instances").

Where there is no election or unanimity instruction, "some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988), *abrogated on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). This is an error of constitutional magnitude that may be raised for the first time on appeal. *State v. Crane*, 116 Wn.2d 315, 325, 804 P.2d 10 (1991), *abrogated on other grounds by In re Pers. Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002).

However, an election or unanimity instruction is not automatically required just because the State *could have* filed multiple charges and declined to do so. *State v. Lee*, 12 Wn. App. 2d 378, 397, 460 P.3d 701, *review denied*, 195 Wn.2d 1032 (2020). Neither an election nor a unanimity instruction is required if the State filed a single charge based on "a continuing course of conduct." *Petrich*, 101 Wn.2d at 571; *State v. Gooden*, 51 Wn. App. 615, 618, 754 P.2d 1000 (1988).

We review whether an election or unanimity instruction was required de novo. *Lee*, 12 Wn. App. 2d at 393. We determine whether the acts alleged may constitute "one continuing offense" by evaluating the facts "in a [commonsense] manner." *Petrich*, 101 Wn.2d at 571. This includes considering whether the acts "occurred in a separate time frame and identifying place." *Id.*

In *Lee*, Division One concluded that where the defendant's "acts of sexual penetration involved the same victim, . . . occurred in one place, . . . occurred within a brief period of time, . .

6

. and occurred for the single purpose of [the defendant's] sexual gratification," the "acts were plainly a continuing course of conduct, and no election or unanimity instruction was required." 12 Wn. App. 2d at 397; *see also State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (concluding that there was no violation of the defendant's right to a unanimous jury verdict where the "two acts of assault" alleged, kissing and hitting, "occurred in one place during a short period of time between the same aggressor and victim" and "evidence[d] a continuing course of conduct to secure sexual relations").

B.      Allegations Against Marquez

The record here shows that the State properly charged and the jury properly convicted Marquez with one continuing course of conduct. Although there was testimony regarding a touching with Marquez's tongue and a separate touching with his penis, there was no indication that these occurred in separate locations or at separate times. The only victim in this case was KR. She remembered that the touching occurred in her bedroom, and she told Feddema that it "happened after they had a family movie night down at the movie theaters, which was . . . around the 1st [of July]." VRP (Feb. 28, 2020) at 389-90. This testimony showed that Marquez's acts were part of a single incident. The State also presented the allegations as a single incident in its closing argument. *See id.* at 404 ("[I]t would have been on the 1st.").

Like in *Lee*, the record shows that the alleged acts "involved the same victim, . . . occurred in one place, . . . occurred within a brief period of time, . . . and occurred for the single purpose of [the defendant's] sexual gratification." 12 Wn. App. 2d at 397. Therefore, the "acts were plainly a continuing course of conduct, and no election or unanimity instruction was required." *Id.*

Marquez cites to *Gooden*, where Division One said that "child molestation, unlike promoting prostitution, is not an ongoing enterprise." 51 Wn. App. at 620. But Division One compared these two offenses to explain why, for the crime of promoting prostitution, the State was permitted to argue a continuing course of conduct that stretched over a 10-day period. *See id.* In context, it is clear that the *Gooden* court was distinguishing *Petrich*, which involved multiple incidents of rape and sexual abuse spanning more than one year. *Id.* ("This case is unlike the *Petrich* case which involved numerous incidents of criminal conduct with the same child victim; child molestation, unlike promoting prostitution, is not an ongoing enterprise."); *see also Petrich*, 101 Wn.2d at 568. Nothing in *Gooden* suggested that child molestation occurring at one time, in one place, and with one victim can never be a continuing course of conduct for purposes of a unanimity instruction.

Marquez also cites *State v. Tili*, 139 Wn.2d 107, 117, 985 P.2d 365 (1999), to support the proposition that "[e]ach act of sexual contact is separate and distinct." Br. of Appellant at 9. However, in *Tili*, the Supreme Court was engaging in a double jeopardy analysis, not considering whether the defendant's right to a unanimous jury had been violated, and that case involved separate acts of penetration where the prosecutor charged multiple counts of rape. *See Tili*, 139 Wn.2d at 117. Here, the prosecutor charged a single count of child molestation. Thus, neither *Gooden* nor *Tili* undermines the commonsense application of a continuing course of conduct analysis under *Petrich*.

Marquez's right to a unanimous jury verdict was not violated, and the trial court did not err. We affirm Marquez's conviction.

8

## II. COMMUNITY CUSTODY CONDITIONS

### A.    Costs of Counseling

Marquez asks that the community custody provision requiring him to "pay for all counseling services/therapy costs incurred by [KR] and members of [her] immediate family as a direct result of [the] assault" be stricken because it is not authorized by the Sentencing Reform Act of 1981, chapter 9.94A RCW. CP at 57. The State concedes that this provision is not authorized and should be stricken.

Court-imposed restitution "may include the costs of counseling reasonably related to the offense." RCW 9.94A.753(3). However, to impose restitution, "the court shall determine the amount of restitution due at the sentencing hearing or within one hundred eighty days." RCW 9.94A.753(1). The court may not impose restitution as a condition of community custody. *See* RCW 9.94A.703; *State v. Land*, 172 Wn. App. 593, 604, 295 P.3d 782 (2013) (striking a condition of community custody requiring the defendant to "pay restitution to the victims in the form of payment for their counseling and medical treatment" because the court did not order restitution at sentencing and the "statutory time period [for] requesting restitution ha[d] passed").

Because the trial court did not order restitution at sentencing and 180 days have passed, we accept the State's concession and direct the trial court to strike this provision on remand.

### B.    Plethysmograph Testing

As a condition of his community custody, Marquez is required to "undergo, at [his] expense, periodic polygraph and/or plethysmograph testing to measure treatment progress and compliance at a frequency determined by [his] Sexual Offender Treatment Provider (SOTP), [community corrections officer], or [Department of Corrections] Policy." CP at 58. He asks that

9

this provision be modified "to specify only Marquez's SOTP may order plethysmograph examinations." Br. of Appellant at 20. The State concedes that the reference to a community corrections officer should be stricken.

Division One has held that requiring an offender to "submit to plethysmograph testing at the discretion of a community corrections officer violates [the offender's] constitutional right to be free from bodily intrusions." *Land*, 172 Wn. App. at 605. This type of testing "can properly be ordered incident to crime-related treatment by a qualified provider. But it may not be viewed as a routine monitoring tool subject only to the discretion of a community corrections officer." *Id.* (citation omitted); *see also State v. Alcocer*, 2 Wn. App. 2d 918, 925, 413 P.3d 1033 (2018) (Division Three opinion rejecting a similar condition as "improperly authorizing the community corrections officer to require plethysmograph testing" and remanding to clarify that such testing "should only be used at the direction of the sexual deviancy evaluator and/or treatment provider"), *abrogated on other grounds by State v. Johnson*, 4 Wn. App. 2d 352, 421 P.3d 969 (2018).

We accept the State's concession and direct the trial court to strike the reference to the community corrections officer and Department of Corrections policy on remand, allowing only the SOTP to require plethysmograph testing.

III. LEGAL FINANCIAL OBLIGATIONS

A.     <u>Supervision Fee</u>

According to his judgment and sentence, Marquez is required to "pay supervision fees as determined by [the Department of Corrections]," but he argues the imposition of this discretionary legal financial obligation was contrary to the trial court's stated intention to "only . . . impose the

mandatory minimum of $600." CP at 49; Br. of Appellant at 20.[2] The State claims that the trial court's intention is unclear and asks for clarification on remand.

"Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the department." RCW 9.94A.703(2)(d). Because the court may waive supervision fees, they are a discretionary financial obligation. *State v. Spaulding*, 15 Wn. App. 2d 526, 536, 476 P.3d 205 (2020). This court has remanded for the trial court to "reevaluate the imposition of the supervision fee" where it is "unclear . . . whether the trial court actually intended to impose a supervision fee as [a legal financial obligation]." *Id.* at 537.

The trial court will have the opportunity to revisit the supervision fee and clarify its intention on remand.

B.      Interest

Marquez's judgment and sentence states that his financial obligations will "bear interest from the date of the judgment until payment in full, at the rate applicable to civil judgments." CP at 51. However, RCW 10.82.090(1) provides, "As of June 7, 2018, no interest shall accrue on nonrestitution legal financial obligations." Because the trial court did not impose restitution and Marquez was sentenced in 2020, this provision should be stricken on remand.

CONCLUSION

We affirm Marquez's conviction for first degree child molestation and remand for the trial court to modify Marquez's conditions of community custody consistent with this opinion, revisit

---

[2] Marquez is also required to "[p]ay supervision fees as determined by the Department of Corrections" as a condition of his community custody. CP at 57.

No. 54755-4-II

the supervision fee, and strike the provision allowing interest to accrue on legal financial obligations.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

We concur:

Cruser, J.

Veljacic, J.